UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


AIMEE R. MARTIN,                             )        CASE NO. 5:14CV403
                                             )
              Plaintiff,                     )        JUDGE SARA LIOI
                                             )        Magistrate Judge George J. Limbert
        v.                                   )
                                             )
CAROLYN W. COLVIN[1],                        )        REPORT AND RECOMMENDATION
ACTING COMMISSIONER OF                       )        OF MAGISTRATE JUDGE
SOCIAL SECURITY,                             )
                                             )
              Defendant.                     )


        Plaintiff Aimee R. Martin ("Plaintiff") requests judicial review of the final decision of the

Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB")

and application for Supplemental Security Income ("SSI").  ECF Dkt. #1.  Plaintiff asserts that the

Administrative Law Judge ("ALJ") erred in her decision because she did not afford the opinions of

Plaintiff's treating psychiatrist and treating counselor the proper weight when determining that

Plaintiff had the residual functional capacity ("RFC") to perform a range of low-stress, unskilled

work.  ECF Dkt. #14.

        For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's

decision and dismiss Plaintiff's case with prejudice.

## I.      PROCEDURAL AND FACTUAL HISTORY

        Plaintiff filed applications for DIB and SSI on April 5, 2011, alleging a disability onset date

of July 31, 2000.  ECF Dkt. #13 ("Tr.") at 184-94.  The Social Security Administration ("SSA")

denied Plaintiff's applications initially and upon reconsideration.  *Id.* at 99-149, 152-56.  Plaintiff

requested a hearing before an ALJ, which was held on October 5, 2012.  *Id.* at 52.

        On October 25, 2012, the ALJ issued a decision finding that Plaintiff met the insured status

requirements of the Social Security Act through December 31, 2005.  Tr. at 37.  The ALJ determined

that Plaintiff had not engaged in substantial gainful activity since July 31, 2000, the alleged onset

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security,
replacing Michael J. Astrue.

date, and that Plaintiff suffered from severe impairments, including depressive disorder, anxiety disorder, and obsessive compulsive disorder, thus satisfying the first two steps of the sequential analysis.  *Id.*  The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.* at 38.  The ALJ determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967, with certain exceptions.  *Id.* at 49.  The ALJ also found that Plaintiff was unable to perform any past relevant work, but, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in that national economy and state economy that Plaintiff could perform.  *Id.* at 44.  Based on the above findings, the ALJ held that Plaintiff had not been under a disability, as defined in the Social Security Act, from July 31, 2000 through the date of the decision.  *Id.* at 45.

Plaintiff appealed the ALJ's decision to the Appeals Council, and the Appeals Council denied her request for review.  Tr. at 1.  The ALJ's decision therefore became the final decision of the Commissioner.

## II.    RELEVANT MEDICAL EVIDENCE

Since Plaintiff's assertions of error concern the ALJ's decision only as to Plaintiff's mental health, the Court will limit Plaintiff's medical history to her mental health treatment.

The earliest medical evidence cited on the record is an August 18, 2003 examination, during which, Dr. Shishuka Malhotra, M.D., found Plaintiff to be very tearful and anxious, with psychomotor agitation and social phobia.  Tr. at 292.  Plaintiff was assigned a global assessment of functioning (GAF) score range of 45-50, indicating serious symptoms or serious impairment in social, occupational, or school functioning.  *Id.*; ECF Dkt. #14 at 3.  Dr. Malhotra's progress notes, dating from August 21, 2003 through December 10, 2003, indicate that Plaintiff experienced a range of symptoms, reported feelings of panic and anxiety during some meetings, and reported improvements during other meetings, including a stable mood and reduced feeling of panic, anxiety, and obsessive compulsion.  Tr. at 295-97.  On November 23, 2004, Dr. Malhotra met with Plaintiff and diagnosed mild depression, sleep problems, and continued obsession with cleaning.  Tr. at 298.

On December 14, 2004, Plaintiff reported to the Aultman Hospital emergency department complaining that she felt like she could not "handle things," was crying all the time, and had no energy. Tr. at 345. The final diagnosis was major depression, although the report indicated that Plaintiff had no obvious suicidal ideation. *Id.* at 345-46. On February 5, 2005, Plaintiff returned to the Aultman Hospital emergency room with a self-inflicted laceration to her left wrist following the receipt of a ticket for driving under the influence ("DUI"). *Id.* at 348. During this emergency room visit, Plaintiff indicated that she did not really want to kill herself, and that she was feeling angry that she got no support from her family. *Id.* The report indicated that Plaintiff seemed upset with an offer to be admitted to the hospital with restrictions because she did not want to be admitted, claimed that she was not suicidal and was regretful about her statements, and felt that her actions were more of a noncompliance gesture than a gesture of anger. *Id.* at 349.

On February 22, 2005, Dr. Malhotra indicated that Plaintiff had increased her drinking and had spent three days in jail. Tr. at 299. On March 29, 2005, Dr. Malhotra noted that Plaintiff was going through a rough time and was still feeling anxious. *Id.* at 300. Dr. Malhotra indicated that Plaintiff's mood was improved during an April 23, 2005 meeting. During a May 31, 2005 meeting, Dr. Malhotra stated that Plaintiff felt like "she can jump out of skin" [sic] and was sleeping "ok" [sic]. *Id.* at 301. Dr. Malhotra, in progress notes dated July 27, 2005, noted that Plaintiff's mood was anxious and depressed, and that Plaintiff indicated she was experiencing stress because she was worried about money since she was a stay-at-home mother and had not worked in five years, and because she did not have transportation as a result of her DUI charge. *Id.* at 302. Progress notes dated from August 19, 2005 to December 17, 2005 indicate that Plaintiff met with Dr. Malhotra regularly during this period. *Id.* at 303-04. Additional progress notes indicate that Plaintiff met with Dr. Malhotra, or other members of Dr. Malhorta's practice, regularly from January 2007 through November 28, 2007. *Id.* at 295-308, 316-22. Psychiatric progress notes dated September 20, 2007 state that Plaintiff said she "felt good," however, psychiatric progress notes from October 18, 2007 indicate that Plaintiff was anxious and edgy, and that she had relapsed. *Id.* at 311-12. During Plaintiff's final visit with Dr. Malhotra, Plaintiff again indicated that she was feeling anxious. *Id.* at 310.

On October 21, 2009, Plaintiff reported to the Aultman Hospital emergency department complaining of feeling jittery and anxious, "[c]rawling on her skin," and wishing she would die (although the emergency department note indicated that Plaintiff was not suicidal and would not take any action to end her life). Tr. at 365. Plaintiff was diagnosed with "depression, medication reaction," and discharged. *Id.* at 366.

On December 2, 2009, Plaintiff began treatment with Susan McCollum, LPC, at Phoenix Rising Behavioral Health ("Phoenix Health"). Tr. at 388-98. The Adult Diagnostic Assessment prepared by Ms. McCollum stated that, at the assessment, Plaintiff indicated that she was suffering from anxiety, panic attacks, and a lack of sleep, and experiencing visual hallucinations. *Id.* at 388. At this point in time, Plaintiff only sought medication to stabilize her mood. *Id.* Plaintiff was assigned a GAF score of 49. *Id.* at 397.

Plaintiff returned to Aultman Hospital on December 16, 2009, complaining of suicidal thoughts. Tr. at 367. Plaintiff was diagnosed with a depressed mood and suicidal thoughts. *Id.* at 368. Plaintiff declined admission, stating that she would rather spend the night at home and that she would return the following day if the suicidal thoughts persisted. *Id.*

Plaintiff underwent an initial psychiatric evaluation at Phoenix Health on December 24, 2009. A mental status examination indicated that Plaintiff was suffering from severe depression, moderate anxiety, severe irritability, moderate constricted affect, moderate loss of interest, mild anhedonia, mild impairment of memory, moderate impairment of concentration, and severe withdrawal. Tr. at 408. A GAF score of 60, indicating moderate impairment in functioning, was assigned to Plaintiff. *Id.*

On February 22, 2010, Plaintiff was assessed as being anxious, down, and dysphoric. Tr. at 430-31. On March 4, 2010, Plaintiff indicated to Ms. McCollum that she was having suicidal thoughts almost daily, but would not act on these thoughts because of her children. *Id.* at 383. Plaintiff indicated that she hoped that the suicidal thoughts would improve. *Id.* On April 21, 2010, Plaintiff reported that she was still feeling depressed, but feeling better, and that she had applied for jobs and SSI. *Id.* at 428. On May 13, 2010, Plaintiff reported that her suicidal thoughts had increased, and that she was searching for a job via the Internet. *Id.* at 382.

-4-

Plaintiff was admitted to Mercy Medical Center on July 5, 2010 after being found by her mother in the kitchen holding a knife and threatening to harm herself. Tr. at 329. Plaintiff indicated that she was having a hard time functioning on a day-to-day basis, and, according to the discharge diagnosis, her mental state revealed mood swings with concentration problems, a small amount of impulsivity, and fleeting thoughts of suicide. *Id.* Plaintiff was assigned a GAF score of 45, a drop from a score of 65 assigned a year earlier. *Id.* at 329. Plaintiff was discharged on July 8, 2010 after being diagnosed as being a little calmer, sleeping better, and no longer being suicidal. *Id.* at 330.

On November 15, 2010, Plaintiff began meeting with Dr. Nalini Morris, D.O., at Phoenix Health for treatment and medication monitoring. Tr. at 418. Dr. Morris noted Plaintiff was experiencing panic, anxiety, occasional visions, and anxiety around others. *Id.* Dr. Morris also noted that Plaintiff quit her job long ago to stay at home. *Id.* On November 30, 2010, Ms. McCollum indicated that Plaintiff was anxious and had shaky hands. *Id.* at 381. Additionally, Ms. McCollum listed diagnoses of bipolar I disorder (mixed, moderate), rule-out major depressive disorder (recurrent), and generalized anxiety disorder (probable obsessive compulsive disorder), and assigned Plaintiff a GAF score of 53. *Id.* at 386. On December 21, 2010, Ms. McCollum noted that Plaintiff was anxious, nervous, and depressed, and reported no instances of visual hallucinations. *Id.* at 380. Ms. McCollum further noted that Plaintiff denied any plan or intent of suicide, but was still concerned about anxiety in public and took two to three baths per day. *Id.*

On December 27, 2010, Dr. Morris noted that Plaintiff appeared nervous and that her voice was shaky. Tr. at 416. On January 4, 2011, Ms. McCollum indicated that Plaintiff was calmer and less depressed. *Id.* at 379. Dr. Morris noted that Plaintiff was depressed and tearful on February 7, 2011. *Id.* at 414. Ms. McCollum's February 15, 2011 notes state that Plaintiff was feeling nervous, having memory problems, and felt like people were staring at her in public, although Plaintiff was aware that people were not focused on her when she was in public. *Id.* at 378. On March 22, 2011, Dr. Morris noted that Plaintiff was still crying easily, anxious when leaving her house, and having nightmares, although Dr. Morris also noted that Plaintiff was, for the first time, able to talk during the meeting without crying. Tr. at 410. On March 31, 2010, Dr. Morris indicated that Plaintiff was waking up groggy, lacked motivation, and had been crying frequently. *Id.* at 377.

-5-

In May 2011, state agency psychiatric consultant Dr. John Waddell, Ph.D., reviewed Plaintiff's medical records.  Tr. at 104-08.  Regarding Plaintiff's sustained concentration and persistence limitations, Dr. Waddell opined that Plaintiff was not more than moderately limited in any of the categories listed on the Mental RFC Assessment.  *Id.* at 107.  Dr. Waddell did not indicate that Plaintiff would have any more than a moderate limitation in any of the categories related to her social interaction limitations.  *Id.* at 108-09.  Likewise, Dr. Waddell did not opine that Plaintiff would have any more than moderate limitions regarding her adaptive limitations.  *Id.* at 108.  Dr. Waddell concluded that Plaintiff could perform past relevant work, and that Plaintiff was not disabled.  *Id.* at 109.

On May 12, 2011, Ms. McCollum completed a Daily Activities Questionnaire for the Ohio Bureau of Disability Determination.  Tr. at 474-75.  On the Daily Activities Questionnaire, "finances" is the only listed behavior or deficit that would prohibit Plaintiff's independent living.  *Id.* at 474.  The Daily Activities Questionnaire continued, stating that Plaintiff had not worked for ten years because she was a stay-at-home mother.  *Id.*  When asked to give examples of anything that might prevent work activities typical for a usual day or work week, the response given stated, "Does not do well around a lot of people; is germaphobic; feels depressed."  *Id.* at 474.  When asked to describe in detail Plaintiff's ability to care for her own needs, Ms. McCollum's response indicated that Plaintiff could perform household chores (and did so in an obsessive compulsive manner), could upkeep her personal hygiene, did not do well in stores where there were many people, did not drive or use public transportation, could manage banking and bill paying, and did not report any hobbies, although it was noted that Plaintiff enjoyed outdoor summer activities.  *Id.* at 475.

On May 31, 2011, Dr. Morris completed a Mental Status Questionnaire for the Ohio Bureau of Disability Determination.  Tr. at 471-73.  The Mental Status Questionnaire indicated that Plaintiff had been under a great deal of stress due to civil court matters, had been sleeping a lot, had low energy, and experienced shakes and trembles throughout the day.  *Id.* at 471.  The Mental Status Questionnaire also indicated that Plaintiff's reports of anxiety had increased, and that she was experiencing occasional hallucinations, some memory problems, poor concentration, and a lowered

-6-

ability to concentrate. *Id.* at 471-72. The Mental Status Questionnaire also noted that Plaintiff would be able to manage any benefits to which she may be deemed entitled. *Id.* at 472.

On June 20, 2011, Dr. Morris noted that Plaintiff's condition had improved since her divorce had been finalized, although she was still experiencing occasional tearfulness and upper body jitters. Tr. at 503. On examination, Plaintiff was alert and did not display any symptoms of psychosis, had brighter affect, and continued to have fair insight and judgment. *Id.* On August 11, 2011, psychiatric treatment process notes indicated that Plaintiff was happier, felt less stress, and had not been as compulsive about household tasks. *Id.* at 505. On August 26, 2011, Ms. McCollum indicated that Plaintiff reported a miscarriage, but was handling the miscarriage as well as possible. *Id.* at 508. Additionally, Plaintiff indicated she was staying off her medications while trying to become pregnant. *Id.*

On September 22, 2011, Ms. McCollum noted that Plaintiff was having a "terrible time" stopping her medications, was experiencing withdrawal symptoms, and chose to continue taking only her anxiety medication. Tr. at 546. Plaintiff reported occasional tearfulness, increased cleaning, and an inability to sit still. *Id.* Ms. McCollum indicated that Plaintiff's affect was bright, but she had problems sitting still for long periods of time. *Id.* at 542. On November 17, 2011, Plaintiff reported to Ms. McCollum that she was having a hard time stopping her medications (in her effort to become pregnant), that she was finding it difficult to leave the house, that she was feeling flustered and forgetful, and that she had been cleaning more than usual. *Id.* at 531.

On December 1, 2011, Ms. McCollum completed a Mental Residual Functional Capacity Questionnaire (the "First RFC Questionnaire"). Tr. at 514-18. The First RFC Questionnaire diagnosed Plaintiff with bipolar disorder II (depressed) and assessed a GAF score of 54. *Id.* at 514. Ms. McCollum identified Plaintiff's symptoms, and then rated all of Plaintiff's mental abilities and aptitudes needed to do unskilled work as either "unlimited or very good," or "limited but satisfactory" (although it appears that Ms. McCollum rated several mental abilities and aptitudes as close to "seriously limited, but not precluded"). *Id.* at 515-16. Ms. McCollum indicated that Plaintiff's ability to deal with the stress of semiskilled and skilled work was "unable to meet competitive standards." *Id.* at 517. The category measuring Plaintiff's ability to understand and

-7-

remember detailed instruction was marked as both "limited but satisfactory" and "unable to meet competitive standards," although it is unclear from the record the meaning of this dual marking. *Id.* Ms. McCollum marked "unable to meet competitive standards" for the categories measuring Plaintiff's mental abilities and aptitudes relating to her ability to interact appropriately with the general public, travel in an unfamiliar place, and use public transportation. *Id.* at 517. Ms. McCollum also opined that Plaintiff's impairments would cause her to be absent from work more than four days a month. *Id.* at 518.

Dr. Morris also completed a Mental Residual Functional Capacity Questionnaire (the "Second RFC Questionnaire") on December 8, 2011. Tr. at 520. The Second RFC Questionnaire was largely the same as the First RFC Questionnaire completed by Ms. McCollum, except that Dr. Morris opined that Plaintiff would be "seriously limited, but not precluded" in her ability to maintain attention for a two-hour segment while performing unskilled work. *Id.* at 522. Additionally, Dr. Morris assigned Plaintiff a GAF score of 60. Despite these changes, and several additional changes that were not material, the Second RFC Questionnaire prepared by Dr. Morris is an exact copy of the First RFC Questionnaire prepared by Ms. McCollum. In fact, significant portions of the Second RFC Questionnaire, presumably signed by Dr. Morris (the signature is illegible, but Dr. Morris' name appears on the first page), appear to have been prepared by Ms. McCollum.

On December 14, 2011, Ms. McCollum noted that Plaintiff had a labile mood and affect, was anxious, and was unsure whether she could go without her medication for the duration of her pregnancy. Tr. at 526. Ms. McCollum indicated that Plaintiff was experiencing a high level of anxiety on February 1, 2012, as a result of being off her medications. *Id.* at 562. On February 21, 2012, Ms. McCollum noted that Plaintiff was upbeat and talkative, and was attending medical appointments and grocery shopping. *Id.* at 560.

Plaintiff visited Dr. Morris on March 5, 2012. Tr. at 549. Dr. Morris indicated that Plaintiff had become more irritable and had difficulty with insomnia, but also opined that Plaintiff was experiencing no psychosis and was only mildly anxious. *Id.* at 549.

On April 19, 2012, Ms. McCollum noted that Plaintiff was happy, talkative, and more relaxed, but was still having problems with her memory and sleeping, the latter being largely due

-8-

to pregnancy. *Id.* at 555.  Ms. McCollum indicated, on May 10, 2012, that Plaintiff was feeling anxious over not taking her medications.  On May 31, 2012, Ms. McCollum noted that Plaintiff was upbeat and had a decreased level of anxiety, despite Plaintiff indicating that she had many worries. *Id.* at 551.  On July 30, 2012, Dr. Morris noted that Plaintiff did not want to resume her medications because she was still nursing her newborn child.  *Id.* at 569.  On August 7, 2012, Ms. McCollum noted that Plaintiff was on edge because she was not taking her medications so that she could nurse her baby.  *Id.* at 571.  On August 9, 2012, Ms. McCollum indicated that Plaintiff was smiling, but acknowledged an increase in anxiety symptoms.  *Id.* at 571. Additionally, Ms. McCollum noted that Plaintiff was taking four to five showers per day, and was having her children shower more frequently.  *Id.*

### III.    HEARING TESTIMONY

On October 5, 2012, the ALJ held a hearing at which Plaintiff, represented by counsel, and a vocational expert ("VE") testified.  Tr. at 52-98.  After a brief opening statement by Plaintiff's counsel, Plaintiff was sworn in and examined by the ALJ.

Plaintiff stated that she was thirty-seven years old, divorced, and that she had three children. Tr. at 59.  Plaintiff indicated that she was living in a house paid for by her boyfriend, and that her only source of income was her boyfriend's employment.  *Id.* at 60.  There was a car available to Plaintiff, owned by her boyfriend, and she was insured to operate the vehicle.  *Id.* at 61.  Plaintiff stated that she had previously worked as a housekeeper, and in a pharmacy packaging medications. *Id.* at 62-63.

Plaintiff stated that she had not worked since 2000, save a couple of days in 2010 before she was fired for failing a background check.  Tr. at 65-66.  Following questions regarding her past employment, Plaintiff testified that she had not been able to work since 2000 due to her obsessive compulsive disorder, panic attacks, and bipolar disorder.  *Id.* at 66-71.  Plaintiff stated that the medication she was prescribed to help control her impairments made her very sleepy.  *Id.* at 67-68. Continuing, Plaintiff testified that her medications never allowed her to reach a level of feeling totally comfortable.    *Id.* at 68.  Plaintiff stated that she had visited Dr. Malhotra (spelled phonetically in the Transcript) between 2000 and 2005.  *Id.* at 69.

The ALJ asked Plaintiff about her panic attacks, and Plaintiff testified that the panic attacks occurred both inside and outside of her home, and that during a panic attack she became short of breath and wanted to be left alone.  *Id.* at 69.  When questioned about the frequency of her panic attacks in the week or two prior to the hearing, Plaintiff stated that she had at least one panic attack a week, but sometimes up to two or three a week (it is unclear from the testimony whether Plaintiff is referring to the week or two before the hearing or some longer duration of time).  *Id.* at 70.  Plaintiff testified that she did not know what caused the panic attacks, and believed that the attacks were becoming worse.  *Id.*

The ALJ asked Plaintiff if she had other mental problems, and Plaintiff stated that she had suicidal thoughts.  Tr. at 70.  When asked how frequently she had suicidal thoughts, Plaintiff stated, "I don't want to die but I can - I think about it quite often."  *Id.*  Plaintiff also indicated that she had crying spells every day.  *Id.*

When discussing her bipolar disorder, Plaintiff stated that sometimes she would be in a very good mood one minute, and a bad mood the next minute.  Tr. at 71.  Plaintiff indicated that she did not know what triggered her bipolar disorder.  *Id.*

Plaintiff testified that there had never been a period of time in which she had been unable to take care of her children, and that she was a great mother and had always maintained custody of her children.  Tr. at 71.  Plaintiff stated that her mother helped with the children.  *Id.*  Plaintiff testified that she took her children to the park, but never stayed for very long, and that she could not remember the last time she took the children out for an activity.  *Id.* at 72.

The ALJ asked Plaintiff to describe a typical day.  Tr. at 72.  Plaintiff testified that she generally woke around 6:15 a.m., prepared her two older children for school, and fed the youngest child.  *Id.* at 73.  Plaintiff stated that she was able to clean and take care of her youngest child, and that her oldest child occasionally helped, though not strictly out of necessity.  *Id.*  Plaintiff testified that she did a large amount of cleaning during the day, and occasionally cooked meals, which she found relaxing.  *Id.* at 73-74.  Plaintiff further stated that she received help around the house from her boyfriend, and her mother assisted by doing the laundry because there was no washing machine in Plaintiff's house.  *Id.*

-10-

The ALJ then inquired into what Plaintiff believed to be the source of her sleeping problems, and whether having a new baby might have disrupted Plaintiff's sleep cycle. Tr. at 74-75. Plaintiff stated that she had always had problems sleeping, even prior to the birth of her youngest child. *Id.* at 75. Plaintiff also indicated that she was a very light sleeper and heard everything during the night. *Id.*

Plaintiff testified that she had made a suicide attempt back in 2004 or 2005, and during the attempt she had slit her wrists. Tr. at 75. Continuing, Plaintiff, responding to questions from the ALJ, stating that she never had any thoughts of hurting her children and that it was her children that had stopped her from acting on her suicidal thoughts. *Id.* at 75-76. Plaintiff testified that she yelled at her children, although she did not like to yell at them, and that she had never punished her sons physically. *Id.* at 76. Plaintiff testified that her relationship with her boyfriend was "great." *Id.*

The ALJ then questioned Plaintiff about her cleaning habits. Tr. at 77. Plaintiff testified that cleaning was an ongoing occurrence from the time she woke up until the time she went to bed, with occasional breaks to stop and relax or to do something with the baby. *Id.* Plaintiff indicated that she had participated in this same type of obsessive cleaning behavior while she had been working in the past. *Id.*

Plaintiff testified that her mother and sister were her only friends with whom she communicated. Tr. at 78. Plaintiff continued, stating that she had friends with whom she did not communicate, also stating that she had two good friends, one of whom had stopped by to visit with the baby. *Id.* Plaintiff stated that she did not leave the house much with her boyfriend. *Id.* Plaintiff testified that she had problems helping her older children, one of whom was in fourth grade, with their homework. *Id.* Plaintiff further testified that she communicated via text message with her children while they were staying with their father. *Id.* at 79-80. After Plaintiff responded to these questions, the ALJ concluded her questioning. *Id.* at 80.

Next, Plaintiff was examined by her attorney. Tr. at 80. Plaintiff testified that she could not sit and watch the entirety of a television program. *Id.* Plaintiff stated that she must pause a two hour movie between two and four times so that she could stand up and move around because she would be antsy. *Id.* at 81.

-11-

When asked whether Plaintiff was, for the most part, able to care for her baby, she answered in the affirmative. Tr. at 81. Plaintiff indicated that there were no days when she felt overwhelmed caring for her baby. *Id.* at 82.

Plaintiff's attorney asked Plaintiff about her hospitalization in 2010. Tr. at 82. Plaintiff testified that she had been having suicidal thoughts, and that her mother recommended that she go into treatment for a few days. *Id.* at 82-83.

Plaintiff stated that her hands often shook and that Ms. McCollum recommended that she put silly putty in her hands as treatment. Tr. at 83. Plaintiff further stated that she often has paper towels in her hands at home as a result of this nervous habit. *Id.*

Plaintiff's attorney asked how Plaintiff's symptoms have changed since she was last working in 2000. Tr. at 84. Plaintiff testified that her obsessive compulsive disorder had gotten worse, and that she was cleaning and showering more frequently. *Id.* Plaintiff also stated that her crying spells had become more frequent. *Id.*

When asked about her participation in the activities of her children, Plaintiff stated that she could attend school events occasionally, but could not stay long because she would become "anxious and panicky." Tr. at 85.

The ALJ then questioned Plaintiff regarding her alcohol abuse. Tr. at 86. Plaintiff testified that the last time she had anything to drink was at her cousin's wedding in May 2011. *Id.* Plaintiff stated that she believed that the alcoholic beverage was offered to her in an effort to help her calm down. *Id.* at 87. Plaintiff testified that she stayed for the duration of the wedding, and attended the reception for roughly thirty to forty-five minutes. *Id.* Plaintiff stated that she never had any problems with illegal drugs. *Id.*

The ALJ proceeded to question the VE. Tr. at 87. The ALJ described a hypothetical individual who: was limited to light work, occasionally lifting and carrying twenty pounds, and frequently lifting ten pounds; could sit for about two hours, and stand or walk for six hours; had no limitations regarding pushing or pulling; could frequently reach overhead bilaterally; could frequently climb ramps or stairs; could not climb ropes, ladders, or scaffolding; could frequently balance, stoop, kneel, crouch, or crawl; and could not be exposed to dangerous conditions such as

-12-

unprotected heights, moving mechanical parts, or the operation of a motor vehicle.  *Id.* at 90.  The ALJ explained that this hypothetical individual's mental ability was limited to simple, routine, and repetitive tasks.  *Id.*  The hypothetical individual described could not be subjected to a production rate pace, such as is present in assembly line work, but could perform goal-oriented work, such as the work performed by an office cleaner.  *Id.*  The hypothetical individual could have occasional contact with supervisors, coworkers, and the public, however, the contact should be non-confrontational and in a low-stress work environment where new changes were gradually introduced.  *Id.* at 90-91.

The VE testified that there were jobs in the national economy and state economy that a hypothetical individual, as described above, could perform.  Tr. at 91.  The VE gave the examples of mail clerk, marker, and routing clerk.  *Id.*

The ALJ proposed a second hypothetical individual to the VE.  Tr. at 91.  The ALJ stated that the second hypothetical individual had all the qualities of the first hypothetical individual, but added the condition that the second hypothetical individual only have superficial contact with the public.  *Id.* at 92.  The VE testified that this limitation would not change eligibility for any of the three positions previously offered as examples.  *Id.*

The ALJ then proposed a third hypothetical individual with all the limitations of the previous two, but who also was limited to sedentary work in which the hypothetical individual was not required to lift or carry over ten pounds.  *Id*.  The VE testified that there were jobs that the third hypothetical individual could perform in the national economy and state economy.  *Id.*  The VE provided the examples of addresser, polisher of eyeglass frames, and ticket checker.  *Id.*

For the final hypothetical, the ALJ added the condition that the hypothetical individual, in addition to all the previously stated limitations, would be off task for more than twenty percent of the workday because of an inability to maintain concentration, persistence, and pace, or would be absent for more than two days because of illness.  Tr. at 93.  The VE indicated that such an individual would be unable to maintain any type of employment, and that to maintain employment it would be necessary that the individual be off task for no more than ten percent of the workday.

*Id.*  Additionally, the VE indicated that the number of allowed absences would be limited to one day per month.  *Id.*

The VE was then examined by Plaintiff's attorney.  Tr. at 94.  Plaintiff's attorney asked whether there would be jobs available to the first hypothetical individual if that individual had difficulty maintaining attention for a two-hour segment, and during that time the individual would have a productivity rate of two-thirds the norm.  *Id.* at 94-95.  The VE indicated that there would be no jobs available for such an individual.  *Id.* at 95.  The ALJ then made a closing statement indicating that the alleged disability onset date was not being amended at the time of the hearing, and the ALJ concluded the hearing.  *Id.* at 96-97.

## IV.     STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits.  These steps are:

1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.  An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see*  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.  If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.  If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference."  *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## VI.    ANALYSIS

### A.    RFC

The ALJ's assessment of Plaintiff's RFC was supported by substantial evidence and the ALJ reasonably weighed the opinions of Dr. Morris and Ms. McCollum.  Accordingly, the undersigned recommends that the Court affirm the ALJ's decision.  Since Plaintiff's assertions of error concern the ALJ's decision only as to Plaintiff's mental health, the Court will limit the analysis to issues regarding Plaintiff's mental health.

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, however, Plaintiff's statements concerning the intensity, persistence, and limiting effects of the alleged symptoms were not credible to the extent they were inconsistent with the RFC assessment. Tr. at 40. The ALJ's decision indicated that she considered Plaintiff's diagnoses of obsessive compulsive disorder, anxiety disorder, and depressive disorder, and determined that the existence of these impairments would not preclude Plaintiff from performing all types of work. *Id.* at 41.

The ALJ stated that mental status examinations included in the record have consistently, albeit not universally, reported either minimum or normal findings, and cited several examples. Tr. at 41. The ALJ considered Plaintiff's GAF scores, which ranged from ten to sixty-five, and highlighted that Plaintiff had, most typically and most recently, received a GAF score of fifty-three, indicative of no more than moderate difficulties in social or occupational functioning. *Id.* The ALJ indicated that Plaintiff had followed, until her most recent pregnancy, a stable regime of psychotropic medications, without side effects, that were at least partially effective. *Id.* The ALJ continued, stating that during interviews for the initial consideration levels of the administrative review process, field office interviewers reported no perceivable difficulties in Plaintiff's coherency, concentration, or understanding. *Id.*

The ALJ opined that the evidence indicated that Plaintiff's symptom limitations relevant to Plaintiff's impairments were not as severe as alleged. Tr. at 42. The ALJ indicated that Plaintiff could work because she could perform simple, routine, repetitive tasks in a low-stress environment, free of production rate pace, and which required no more than occasional contact with coworkers, supervisors, and the public. *Id.*

The ALJ also stated that she looked to self-reports and medical records regarding Plaintiff's activities of daily living. Tr. at 42. These reports and records indicated that Plaintiff had the ability to attend to her personal hygiene and grooming, and maintain a household for herself, her boyfriend, and three young children, including cleaning, laundry, and meal preparation. *Id.* The ALJ continued, highlighting that Plaintiff had the ability to engage in child-rearing activities, drive, shop, manage medical appointments and her finances, watch television for pleasure, occasionally attend

movies, and to visit family and close friends.  *Id.*  Based on these activities, the ALJ opined that Plaintiff engaged in daily activities that were not limited to the extent expected given Plaintiff's complaints of disabling symptoms and limitations.  *Id.*  Further, the ALJ stated that while none of these activities considered alone would warrant or direct a finding of not disabled, when considered in combination the activities strongly suggest that Plaintiff would be capable of engaging in workplace activities contemplated by the RFC finding.  *Id.*

The ALJ also reviewed Plaintiff's work history. Tr. at 42. According to the ALJ, the review showed that Plaintiff worked only sporadically prior to the alleged disability onset date, which raised questions as to whether Plaintiff's continuing unemployment was actually due to medical impairments.  *Id.*  Additionally, the ALJ indicated that this question was also raised by the fact that Plaintiff left her last job in 2010 after an adverse background check, rather than as the result of her medical impairments.  *Id.*  The ALJ further noted that Plaintiff had made inconsistent statements on issues central to the resolution of the case, such as the side effects of her medications, and although the inconsistent information provided by Plaintiff might not have been given in an attempt to mislead, the inconsistencies suggest that information provided by Plaintiff may not be entirely reliable.  *Id.*

Based on the above, the undersigned recommends that the Court find that the ALJ's decision was supported by substantial evidence, and thus is conclusive.  *See* 42 U.S.C. § 405(g).  Plaintiff argues that the ALJ's finding that Plaintiff retained the RFC to perform a range of unskilled, low-stress work activity is not supported by substantial evidence.  ECF Dkt. #14 at 11.  Plaintiff's argument fails.  The ALJ made her decision based on the medical examinations of Plaintiff and the associated reports, including Plaintiff's self-reports, and testimony provided during the hearing. Further, the ALJ took Plaintiff's activities of daily living into account when making her determination as to Plaintiff's RFC.  Even if substantial evidence exists in the record that supports Plaintiff's assertion, the Court cannot reverse the ALJ if substantial evidence supports the ALJ's conclusion.  *See Walters*, 127 F.3d at 528.  The undersigned recommends that Court find that substantial evidence supports the ALJ's conclusion regarding Plaintiff's RFC.

-17-

**B.**     **OPINION OF TREATING PSYCHIATRIST**

Plaintiff argues that the ALJ erred in weighing the opinion of the treating psychiatrist, Dr. Morris.  ECF Dkt. #14 at 12.  The undersigned recommends that the Court find that the ALJ reasonably weighed the opinion of Dr. Morris.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security benefits.  Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians.  SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544.   A presumption exists that the opinion of a treating physician is entitled to great deference.  *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007).  On the other hand, "[o]pinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  The ALJ will evaluate every medical opinion received regardless of its source, and if he or she does not attribute controlling weight to a treating medical source, a number of factors will be evaluated in order to determine the weight to give to the medical opinion, including the examining relationship, specialization, consistency, and supportability.  *Id.* (citing  20 C.F.R. §416.927(c)). Other factors "which tend to support or contradict the opinion" may also be considered in assessing any type of medical opinion.  *Id.*  The opinion of a treating physician receives controlling weight only where the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record.  20 C.F.R. § 404.1527(c)(2).  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, more weight will be given to that opinion.  20 C.F.R. § 404.1527(c)(3).

The ALJ attributed "some weight" to Dr. Morris' assessment of Plaintiff's ability to perform unskilled work, with low stress and no contact with the public.  Tr. at 43.  Little weight was given to Dr. Morris' opinion that Plaintiff would miss more than four workdays per month.  *Id.*  In making these determinations, the ALJ looked to the examining relationship between Dr. Morris and Plaintiff, and the consistency and supportability of the medical opinions.  The ALJ indicated that Plaintiff's treating relationship at Phoenix Health for mental health treatment occurred primarily as of 2010,

-18-

which is at least five years after the expiration of the date Plaintiff was last insured.  *Id.*  The ALJ opined that these more recent records indicate that Plaintiff made sound decisions to stop her regimen of psychotropic medications for the sake of her unborn (and later newborn) child, suggesting that Plaintiff had a greater ability to withstand stress than indicated by Plaintiff's allegations.  *Id.*

The ALJ continued, stating that many of the limitations contained in the reports appeared to be based on Plaintiff's self-reports, and found this to be indicative that Dr. Morris had permitted substitution of Plaintiff's judgments for her own.  Tr. at 43.  Continuing, the ALJ indicated that, in reality, patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy a patient's request and avoid unnecessary tension.  *Id.*  The ALJ expressly stated, "[w]hile it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case."  *Id.*

The ALJ has provided good reasons for not providing controlling weight to the opinion of Dr. Morris.  The ALJ cited factors that tend to contradict Dr. Morris' opinion, and demonstrated ways in which the opinion was inconsistent with other substantial evidence in the case record.  Although the ALJ did not discuss these findings at great length during her discussion of weighing Dr. Morris' opinions, the record supports the ALJ's conclusion, as does the ALJ's lengthy analysis of Plaintiff's RFC.  Based on the above, the undersigned recommends that the Court find that the ALJ's decision regarding the weight of Dr. Morris' opinion was based on substantial evidence.

### C.  OPINION OF TREATING COUNSELOR

Plaintiff also argues that the ALJ erred in weighing the opinion of the treating counselor, Ms. McCollum.  ECF Dkt. #14 at 17.  The undersigned recommends that the Court find that the ALJ reasonably weighed the opinion Ms. McCollum.

The ALJ found that no weight was afforded to either the May 2011 Daily Activities Questionnaire or the December 2011 First RFC Questionnaire prepared by Ms. McCollum because she was not an acceptable medical source.  Tr. at 43.  However, the ALJ still discussed both of Ms. McCollum's opinions.  The ALJ stated that the May 2011 Daily Activities Questionnaire indicated

that Plaintiff could not focus or concentrate to understand, remember to carry out instructions, would be unable to withstand the stressors of day-to-day work, and would be nervous around others.  *Id.* Further, the ALJ indicated that Ms. McCollum had seen Plaintiff over a lengthy period, and was reporting within the bounds of her professional certifications, but noted that the May 2011 Daily Activities Questionnaire was not consistent with Ms. McCollum's own practice notes.  *Id.*  The ALJ stated that it appeared that the May 2011 Daily Activities Questionnaire was based, in large part, on Plaintiff's self-reports.  *Id.*  Finally, the ALJ opined that Ms. McCollum's May 2011 Daily Activities Questionnaire was inconsistent with the December 2011 First RFC Questionnaire, and that the inconsistency was not reflected by any discernable change in the treatment record.  *Id.*  The ALJ also noted that Ms. McCollum's December 2011 First RFC Questionnaire essentially mirrored the December 2011 Second RFC Questionnaire submitted by Dr. Morris.  *Id.*

Plaintiff argues that the May 2011 Daily Activities Questionnaire and the December 2011 First RFC Questionnaire submitted by Ms. McCollum appear to be remarkably consistent, and cites several examples of the consistencies.  ECF Dkt. #14 at 18.  Defendant argues that there are unexplained inconsistencies, and cites examples of the inconsistencies.  ECF Dkt. #16 at 14.  While there are both consistencies and inconsistencies in the opinions submitted by Ms. McCollum, this Court's review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott*, 905 F.2d at 922.

The Court finds that the ALJ's conclusion was supported by substantial evidence.  The ALJ indicated that she reviewed the opinions provided by Ms. McCollum and determined, based on the record, that these opinions were inconsistent with Ms. McCollum's treatment notes.  Tr. at 43.  Both Plaintiff and Defendant have provided examples of the similarities and inconsistencies in Ms. McCollum's opinions, respectfully.  ECF Dkt. #14 at 18-19, #16 at 14-15.  Because substantial evidence exists that supports the ALJ's determination that Ms. McCollum's opinions were inconsistent, this Court should not reverse the decision of the ALJ.  *Walters,* 127 F.3d at 528.

Finally, any error by the ALJ in not considering the May 2011 Daily Activities Questionnaire provided by Ms. McCollum as being co-authored by Dr. Morris should be deemed harmless error

because the ALJ has provided reasoning as to why the May 2011 Mental Status Questionnaire prepared by Dr. Morris should be discounted.  Tr. at 43.  Defendant is correct in asserting that the December 2011 First RFC Questionnaire and Second RFC Questionnaire prepared by Ms. McCollum and Dr. Morris, respectfully, are nearly identical, so the ALJ's identification of inconsistencies between the May 2011 opinions and December 2011 opinions submitted by Ms. McCollum would apply equally to Dr. Morris when is came to the consistency of the record.  ECF Dkt. #16 at 15.  Generally, decisions of administrative agencies are reviewed for harmless error. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) (citing *Heston v. Comm'r of Soc. Sec.,* 245 F.3d 528, 535 (6th Cir. 2001) (noting that courts are not required to convert judicial review of agency action into a ping-pong game where remand would be an idle and useless formality) (citation omitted)).  Accordingly, even if Plaintiff is correct in asserting that the ALJ erred by not considering the May 2011 opinion of Ms. McCollum, which Plaintiff alleges was co-authored by Dr. Morris, as submitted by a treating physician, the error was harmless and is not grounds for a remand where, as is the case here, the remand would be a useless formality.

**VII.   CONCLUSION**

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

DATE: June 10, 2015                     ___*/s/George J. Limbert*_____
                                                        GEORGE J. LIMBERT
                                                        UNITED STATES MAGISTRATE JUDGE

-21-